Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 562 - 2 | **DATE** | 8/31/2004 |
| **CASE TITLE** | USA vs. Mark A. Reed | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Reed's motion to suppress incriminating statements he made to law enforcement personnel on July 17, 2000 is again denied, and the court declines to vacate Reed's conviction and sentence.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | AUG 3 1 2004 | |
| | Notified counsel by telephone. | | date docketed | 114 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 8/31/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 00 CR 562 |
| MARK A. REED, | ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

DOCKETED
AUG 31 2004

## MEMORANDUM OPINION AND ORDER

Mark Reed was a passenger in a pickup truck that was pulled over for speeding. During the course of the traffic stop, officers discovered that the horse trailer attached to the truck had nearly $100,000 in cash hidden under some hay and plywood. Reed and his two traveling companions were taken to highway patrol headquarters, where Reed ultimately confessed to engaging in drug trafficking activities. Reed was charged with conspiring to distribute in excess of 50 kilograms of marijuana in violation of 21 U.S.C. § 846, possession with intent to distribute in excess of 50 kilograms of marijuana in violation of 21 U.S.C. § 841, and traveling in interstate commerce to conduct drug transactions in violation of 18 U.S.C. § 1952. He moved to suppress the incriminating statements he made to law enforcement authorities, claiming that they were the fruits of an illegal arrest. Following a suppression hearing, the court denied Reed's motion, concluding that even assuming the arrest was improper, he made the statements voluntarily of his own free will. See United States v. Reed, No. 00 CR 562, 2001 WL 1298703 (N.D. Ill. Oct. 25, 2001).

Shortly thereafter, Reed entered a conditional guilty plea, reserving the right to appeal the court's ruling on the motion to suppress. The Seventh Circuit considered Reed's appeal and remanded the case for further factual determinations as to three issues: (1) first, whether the officer's actions in arresting Reed were coercive or calculated to cause surprise, fright or confusion,

or undertaken to advance the investigation or embark on a fishing expedition, all of which would suggest purposeful and flagrant misconduct by the police and support Reed's motion to suppress; (2) second, whether Reed voluntarily accompanied law enforcement officers to highway patrol headquarters and was arrested only after he confessed to his involvement in drug trafficking offenses, which would render the confession voluntary and require denial of Reed's motion to suppress; and (3) third, whether probable cause existed to arrest Reed before he was taken to highway patrol headquarters, in which case the arrest was proper and not a basis for suppressing Reed's confession. See United States v. Reed, 349 F.3d 457, 465-66 (7th Cir. 2003).

Upon further review, the court finds that the officers had probable cause to arrest Reed at 4:00 p.m. and that Reed's confession was properly admitted at trial. This result is bolstered by the Supreme Court's recent decision in Maryland v. Pringle, 124 S.Ct. 795 (2003), discussed below. Even absent probable cause to arrest Reed at 4:00 p.m., the court adheres to its earlier conclusion that the law enforcement officer's actions were not undertaken in an improper effort to advance an investigation or embark on a fishing expedition. The motion to suppress is therefore denied.

## BACKGROUND

The facts of this matter are more fully presented in this court's October 25, 2001 Memorandum Opinion and Order ("Order"), Reed, 2001 WL 1298703, at *1-4, and in the Seventh Circuit's decision on appeal. Reed, 349 F.3d at 460-62. This opinion assumes the reader's familiarity with the earlier decisions and will summarize the relevant facts here only briefly.

### A. The Traffic Stop

At approximately 2:30 in the afternoon on July 17, 2000, Reed was riding in a pickup truck that was towing a horse trailer with two horses in it and traveling south on Interstate 57 near Peotone, Illinois. Also in the truck were Thomas Martin, the truck's owner, and Alfonso Garnica, the driver. Illinois State Trooper C.G. Fifield pulled the truck over for speeding and arrested

2

Garnica for driving with a suspended license. *Reed*, 349 F.3d at 460; *Reed*, 2001 WL 1298703, at *1. (*See also* Transcript of Suppression Hearing (hereinafter "Tr."), at 5-8, 121-22.) Garnica immediately posted a $100 cash bond and was released at the scene. Officer Fifield then performed background checks on Reed and Martin to determine if either was permitted to drive the truck. He discovered that both men had valid driver's licenses issued in other states but that they also had previous arrests for drug activity. *Id.* (*See also* Tr. at 12-13.)

While performing the background checks, Officer Fifield asked the three men what they were doing in Illinois.[1] Reed told Officer Fifield that Martin had come to Illinois to finalize a divorce and that he was accompanying him because Martin suffered from health problems. *Id.* (*See also* Tr. at 11-12, 124.) According to Reed, Martin told Officer Fifield essentially the same story. Officer Fifield, however, recalled that Martin said he was in Illinois to buy horses, and in his Illinois State Police Field Report ("Field Report"), Officer Fifield noted that "Martin or Garnica couldn't tell [Officer Fifield] where they had gotten the horses or from whom." *Id.* Around the same time, Officer Fifield noticed that all five entrances to the horse trailer were padlocked shut. *Id.* (*See also* Tr. at 9.)

At this point, Martin, who had moved into the driver's seat of the truck, was ready to drive away. Officer Fifield says he told all three men that they were free to leave but Reed does not recall hearing him say this. In any event, before they left, Officer Fifield asked Martin whether there were any guns, drugs, or money in the truck. *Id.*; *Reed*, 2001 WL 1298703, at *2. (*See also* Tr. at 13-14, 154.) Martin denied having any such items and consented to a search of the vehicle at a nearby weigh station where additional police awaited to assist. *Id.* Reed, Martin, and Garnica waited in the weigh station building while police officers searched the truck. At approximately 4:00 p.m., the police found two bundles of cash, totaling $93,981, wrapped in pink cellophane and

---

[1] Reed gave Officer Fifield a Wisconsin driver's license (Tr. 152); Martin had a temporary driver's license from Texas (Tr. 11); and Garnica had a suspended license from Indiana. (Tr. 7.)

hidden under some plywood and hay in the "gooseneck" of the horse trailer (the projecting front end of the trailer that overlapped the truck bed). *Id.* at 460-61; *Reed*, 2001 WL 1298703, at *2. (*See also* Tr. 15-16, 129.) When police confronted the men as to the origin of the cash, Martin explained that the money was the proceeds of an inheritance, an explanation the Seventh Circuit characterized as curious. *Id.* at 461; *Reed*, 2001 WL 1298703, at *2. (*See also* Tr. at 130.)

## B. Reed's Transport to Police Headquarters

There is significant dispute as to what transpired next. Reed claims that the police arrested him, read him *Miranda* warnings, put him in handcuffs, and transported him to Illinois State Police Headquarters in Lockport. Officer Fifield insists that he never arrested or handcuffed Reed, who accompanied him to police headquarters "as a passenger." *Id.* (*See also* Tr. at 17, 130.) In addition, Officer Fifield's police report says nothing about arresting Reed, though it does document Garnica's arrest for driving with a suspended license. *Id.*; (Tr. 103-04.) Reed signed a form waiving his *Miranda* rights at 4:19 p.m., and an investigative report prepared by Special Agent Robert Babcock of the U.S. Customs Service indicates that Reed was in fact arrested shortly after the officers discovered the cellophane-wrapped money at 4:00 p.m. *Id.* (*See also* Tr. at 18, 131.) Customs Agent Babcock testified, however, that the time was a "mistake" – Reed was actually arrested around 11:00 p.m. "or maybe later than that" – and that he only wrote down a 4:00 p.m. arrest time because he did not want to review his notes or call a busy fellow agent for the correct information. (Tr. at 103-04.)

Also in dispute are the events that occurred once Reed reached police headquarters. According to Reed, his handcuffs were removed and he was escorted to a conference room; he was never told that he could leave. *Id.*; *Reed*, 2001 WL 1298703, at *3. (*See also* Tr. at 138-40.) Officer Brian Hafner of the Bollingbrook, Illinois, Police Department testified that he first saw Reed unhandcuffed in a Lockport conference room, that Reed was not handcuffed, and that he (Officer

4

Hafner) specifically told Reed he was not under arrest. *Id.*; (Tr. at 50-52, 71.) Reed admits that Officer Hafner read him his *Miranda* rights and that he signed a second form acknowledging those rights at 5:34 p.m. Over the next few hours, Reed was interviewed several times and also left alone and unrestrained in the conference room for extended periods of time. *Id.*; (Tr. at 51-53, 56, 84-86, 140-41, 173-74.) Officer Hafner testified that the conference room remained unlocked; Reed admits he never tried to open the door but claims he believed doing so would constitute an escape attempt. (Tr. at 83, 171, 182.)

## C.   Reed's Confession

Around 8:35 p.m., officers arrived to take Reed for fingerprinting. Reed claims that at this point he had a change of heart because of the solitary "down time" in the conference room which gave him time to think about the trouble he might be in and about a case pending against him in Illinois for a controlled substance violation. He decided to cooperate with the police in the hope of receiving benefits in return, and offered to lead Officer Hafner to a ranch near Joliet, Illinois where Reed claimed that he, Martin, and Garnica had delivered a shipment of marijuana earlier that day. *Id.* at 461-62; *Reed*, 2001 WL 1298703, at *3. (*See also* Tr. at 54, 56, 59, 143-44, 174.) During this trip, Reed admitted to helping Martin and Garnica transport a shipment of marijuana from Mexico to the ranch in Joliet on a previous occasion. According to Officer Hafner, Reed described waiting in that previous incident in a hotel in Texas for Martin and Garnica to return with marijuana and then driving with them to the Joliet ranch in the same truck and trailer they were using on this occasion. *Id.* at 462; *Reed*, 2001 WL 1298703, at *3. (*See also* Tr. at 54, 63-64.)

After this trip, Reed was interviewed back at police headquarters by customs agents around 10:00 p.m. and similarly recounted the details of transporting marijuana from Mexico to Texas. *Id.*; (Tr. at 144-45.) Officers Hafner and Babcock testified that at the conclusion of this interview, Reed was arrested and taken from police headquarters to the Metropolitan Correctional Center. *Reed,*

5

2001 WL 1298703, at *4; (Tr. at 97, 107, 118.) The state police form filed after the arrest indicates that the arrest occurred at 11:55 p.m. *Id.*

## D. Reed's Initial Motion to Suppress

Reed moved to suppress his confessions to police officers, claiming that he was improperly arrested at 4:00 p.m. without probable cause. This court denied the motion, finding that even if the police lacked probable cause to arrest Reed at 4:00 p.m., his confessions were made voluntarily and of his own free will.[2] Following the three-factor test set forth in *Brown v. Illinois*, 422 U.S. 590 (1975),[3] the court first concluded that Reed confessed voluntarily as evidenced by his own testimony. Specifically, Reed explained that he decided to cooperate with police because he believed it was in his interest to do so, and because he thought he might get some money under an Illinois state program that provides informers with a proportion of the cash and drug street value that their information helps officers to seize. *Id.* Police also gave Reed *Miranda* warnings twice, which further supported a finding that the confession was not "obtained by exploitation of an illegal arrest." *Id.* (citing *Brown*, 422 U.S. at 603).

The court next found that the five- or six-hour span between the alleged arrest and Reed's statements "weigh[ed] in favor of suppressing the statements but only slightly," and that though Reed had time alone between interviews, the evidence was inconclusive as to whether it was sufficient to break the causal chain from the allegedly unlawful arrest and the incriminating

---

[2] The court did find that the government's argument that it had probable cause to arrest Reed at 4:00 p.m. was "not frivolous," noting that (1) Garnica, Martin, and Reed were transporting a large amount of cash wrapped in cellophane and hidden in the trailer floor "while traversing a known drug route"; (2) the three men gave inconsistent explanations for the purpose of their trip; (3) the horse trailer was locked with five separate padlocks; (4) Martin had prior drug convictions and Reed had a recent arrest on a drug charge; (5) none of the men could produce any records relating to the supposed recent purchase of the horses; and (6) Martin lied about the fact that there was money in the trailer. *Reed*, 2001 WL 1298703, at *5 n.3.

[3] The three factors include (1) the voluntariness of the statement; (2) the temporal proximity of the arrest and the confession and the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04.

6

statements. *Id.* Nevertheless, the court denied suppression after finding no evidence of purposeful or flagrant misconduct by the police. *Id.* at *5 (citing *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990)). Reed admittedly understood his *Miranda* rights. In addition, there was nothing to suggest that the police acted in bad faith or in a manner designed to cause surprise, fright, or confusion. *Id.*

### E. The Seventh Circuit's Reversal

On appeal, the Seventh Circuit agreed that Reed's confessions were voluntary and that "there were no intervening circumstances sufficient to purge the taint of the allegedly illegal arrest." *Reed*, 349 F.3d at 463-64. The court pointed out, however, that the mere fact that police officers conducted Reed's interrogation in a congenial and non-threatening manner was not dispositive in proving a lack of bad faith. *Id.* at 465. The court remanded the case for further findings as to whether the officers' actions "were undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence." *Id.* In the court's view, "[s]uch actions would undermine the purpose of the Fourth Amendment, and therefore are relevant to this analysis that ultimately examines whether suppression is necessary for purposes of deterrence or judicial integrity." *Id.* at 465-66. The court also noted unresolved factual questions as to whether the police had probable cause to arrest Reed at 4:00 p.m.; and whether Reed "accompanied the police to headquarters voluntarily and was arrested only after he decided to cooperate and made his confession." *Id.* at 466. In his dissent, Judge Easterbrook opined that the police had probable cause to arrest Reed at 4:00 p.m. based on their knowledge of Reed's and Martin's history of drug dealing; the horse trailer, which hides both the bulk and odor of marijuana; the nearly $100,000 hidden in the trailer; and Martin's implausible and inadequate explanations for the money and the horses. *Id.* at 468.

## DISCUSSION

On remand, Reed again claims that the police had no probable cause to arrest him at 4:00 p.m., and that he had no choice but to accompany the officers to police headquarters, as he was placed in handcuffs. Reed also argues that the police officers' actions were calculated to lead to a confession. The government insists that the officers had probable cause to arrest Reed as soon as they found the nearly $100,000 in cash hidden in the horse trailer, and that his claim of being driven to headquarters in handcuffs is not credible. The government also denies evidence that the police officers utilized tactics intended to coerce or cause surprise, fright, or confusion.

The court first addresses the question of whether Reed was arrested at 4:00 p.m., and whether probable cause supported that arrest. The court then considers the admissibility of Reed's statements, assuming there was no valid arrest at 4:00 p.m.

## A. Time of Arrest

The court first considers whether Reed was in fact arrested at 4:00 p.m. after police officers discovered approximately $93,000 in cash hidden in the horse trailer. The government claims that Reed went to police headquarters voluntarily and unrestrained and that he was not arrested until after he confessed around 9:00 or 10:00 that night. Reed insists that he had no choice but to accompany Officer Fifield to police headquarters – indeed, he was handcuffed – and that he was never informed he was free to leave.

The court is not persuaded that Reed was handcuffed or told he was under arrest at 4:00 p.m. This does not necessarily mean, however, that Reed was not under arrest at that time. "Whether a person has been seized is determined by considering whether a reasonable person, innocent of any crime, would have concluded that he was not free to leave police custody." *A.M. v. Butler*, 360 F.3d 787, 798 (7th Cir. 2004) (citing *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). Whether Reed was in custody at 4:00 p.m. is a close call. Upon careful review of the record, however, the court concludes that the evidence marginally supports Reed's claim of a 4:00

8

p.m. arrest time. Officer Fifield admits that he never told Reed he was free to leave after officers discovered the money in the trailer, and it does not appear that Reed was offered a choice about accompanying officers to police headquarters, where he was given a second *Miranda* warning. (Tr. 42-43.) It is true that Reed rode in the front passenger seat next to Officer Fifield, and that he never asked to leave or to be transported somewhere else. In addition, once Reed arrived at police headquarters, officers left him unattended and unrestrained in an unlocked conference room for long periods of time. (Tr. 17, 53, 99, 135-36.) Nevertheless, a reasonable person in Reed's position arguably would not have felt free to refuse to accompany Officer Fifield to police headquarters and end the interrogation. *See A.M.*, 360 F.3d at 795-96 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)) (a person is "in custody" if a reasonable person in his position would not have felt "at liberty to terminate the interrogation and leave").

### B.    Probable Cause

Assuming Reed, a passenger in Martin's pickup truck, was arrested at 4:00 p.m., the next question is whether there was probable cause for the arrest once police officers discovered some $93,000 in cash hidden in the horse trailer attached to the truck. Reed correctly notes that carrying a large quantity of money, in and of itself, is neither illegal nor sufficient to establish probable cause. (Def. Mem., at 7-8.) *See, e.g., United States v. Currency, U.S. $42,500*, 283 F.3d 977, 981-82 (9th Cir. 2002) ("[a] large amount of money standing alone . . . is insufficient to establish probable cause"). A probable cause determination, however, requires that the court examine the events leading up to the arrest and decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

Here, the police found close to $100,000 in cash, wrapped in cellophane and hidden in the gooseneck of a heavily padlocked horse trailer. Horse trailers are "a popular way to move

marijuana because they have room to hide that bulky substance and the horses' odor masks its smell." *Reed*, 349 F.3d at 466 (Easterbrook, dissent) (citing *United States v. Torres*, 32 F.3d 225 (7th Cir. 1994), and *United States v. Portales*, 52 Fed.Appx. 290, 2002 WL 31688920 (7th Cir. Nov. 22, 2002)). *See also United States v. Peralta-Romero*, 232 F.3d 898 (9th Cir. 2000) (Table); *United States v. Pena-Rodriguez*, 110 F.3d 1120 (5th Cir. 1997). In addition, "cellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs." *$42,500*, 283 F.3d at 982. *See also United States v. Reveles*, 190 F.3d 678, 686-87 (5th Cir. 1999) (marijuana shipments had no odor and were "packaged in industrial cellophane so as to discourage any investigation into their contents"). Martin's explanation for the money (an inheritance) was implausible at best, and according to Officer Fifield, Martin and Reed earlier gave conflicting stories as to why they were in Illinois and could not explain where they had gotten the horses or from whom. In addition, Officer Fifield knew that Martin and Reed had a history of drug dealing. Taken together, this evidence created sufficient probable cause for an arrest.

Reed argues, however, that any such probable cause did not extend to him, a mere passenger in the truck. (Def. Mem., at 9.) The Supreme Court's recent decision in *Maryland v. Pringle*, 124 S.Ct. 795 (2003), is instructive on this point. The defendant in *Pringle* was a front-seat passenger in a car that was stopped for speeding at 3:16 a.m. *Id.* at 798. Also in the car were the driver, who owned the car, and a back-seat passenger. When the driver opened the glove compartment to get his vehicle registration, the officer saw that it held a large amount of rolled-up money. The officer issued the driver an oral warning and also asked if he had any weapons or drugs in the vehicle. The driver said that he did not and consented to a search of the vehicle. *Id.* When the officer conducted the search, he found five glassine baggies of cocaine between the armrest and the back seat of the car. *Id.* He asked the men about the drugs and money but none offered any information. The officer placed all three men under arrest and transported them to the

police station, where Pringle later waived his *Miranda* rights and confessed to being the owner of the drugs. *Id.*

Pringle moved to suppress his confession as the fruits of an illegal arrest. The trial judge denied the motion but the Court of Appeals of Maryland reversed, holding that absent specific facts showing Pringle's knowledge of and dominion over the cocaine, "the mere finding of cocaine in the back armrest when [Pringle] was a front seat passenger in a car being driven by its owner is insufficient to establish probable cause for an arrest for possession." *Id.* at 799. The Supreme Court reversed that decision, however. The Court held that the arresting officer had probable cause to believe Pringle had committed a crime because the baggies of cocaine were accessible to all three men and none offered any information as to who owned the drugs or money: "We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." *Id.* at 800.

The Court was unpersuaded by Pringle's attempt to characterize the case as one of guilt-by-association, noting that unlike in *Ybarra v. Illinois*, 444 U.S. 85 (1979), where the defendant was in a public tavern when police executed a search warrant for the tavern and its bartender, Pringle was a passenger in a private vehicle: "a car passenger – unlike the unwitting tavern patron in *Ybarra* – will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Pringle*, 124 S.Ct. at 801 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999)). *Cf. Ybarra*, 444 U.S. at 91 ("a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person"). The Court found that "[t]he quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." *Pringle*, 124 S.Ct. at 801. Thus, the officer had probable cause to arrest Pringle.

11

In this case, similarly, Reed was a passenger in a car towing a horse trailer hiding close to $100,000 in cash wrapped in cellophane, a material often used to mask the smell of drugs. Martin lied about the presence of the money and his explanation for it once discovered was suspect. The men could not explain where they got the horses in the trailer, which was heavily padlocked, and gave inconsistent reasons for being in Illinois. Reed and Martin, moreover, both had a history of drug activity. Reed makes much of the fact that the cash was in the trailer and not immediately accessible to him inside the truck. The amount of money found, however, as well as the manner in which it was secreted, the fact that horse trailers are often used to transport drugs, and the numerous padlocks, were all fairly indicative of illegal activity, be it drug dealing or money laundering. See Reed, 349 F.3d at 468 (Easterbrook, dissent). It is unlikely that an innocent person would be admitted to such an enterprise so it was reasonable to infer that all three passengers were involved. Thus, the officers had probable cause to arrest Reed at 4:00 p.m. after finding the cash.

## C.  Police Methodology

Even if the police officers did not have probable cause to arrest Reed at 4:00 p.m., his inculpatory statements were nevertheless voluntary and admissible. As this court observed in its earlier decision, and as the Seventh Circuit also noted, this question turns on the purpose and flagrancy of the official misconduct. Reed's interrogation was conducted in a congenial manner and the police officers twice administered Miranda warnings, both of which suggest that the allegedly unlawful arrest and subsequent interrogation were not "calculated to cause surprise, fright, or confusion." Reed, 2001 WL 1298703, at *5; Reed, 349 F.3d at 465. As the Seventh Circuit explained, however, this does not end the inquiry. Reed, 349 F.3d at 465 ("[c]onducting a custodial interrogation after an illegal arrest in a congenial and non-threatening manner does not in and of itself disprove that the police acted in bad faith"). The court must also consider whether

the officers' actions were undertaken "in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence." *Id.*

In *Brown*, for example, the defendant was arrested at gunpoint after officers broke into and searched his apartment, all without a warrant. 422 U.S. at 592. The officers admitted that they arrested Brown "for the purpose of questioning [him] as part of their investigation of [a] murder." *Id.* The Supreme Court held that the arrest without probable cause "had a quality of purposefulness . . . The detective embarked upon this expedition for evidence in the hope that something might turn up." *Id.* at 605. In *Dunaway v. New York*, 442 U.S. 200 (1979), similarly, police arrested the defendant in connection with the murder and attempted robbery of a pizza parlor proprietor, despite the fact that their jailhouse informant did not provide "enough information to get a warrant." *Id.* at 202-03. *See also Taylor v. Alabama*, 457 U.S. 687 (1982) (defendant was arrested on a grocery-store robbery charge without a warrant or probable cause, based on an uncorroborated informant's tip).

The evidence in this case does not suggest that the police officers took Reed to police headquarters merely as some sort of fishing expedition. Officer Fifield initially stopped Reed and his two companions for speeding, not in the hopes of discovering information about a crime as in *Brown*, *Dunaway*, and *Taylor*. Police officers ultimately discovered close to $100,000 hidden in the horse trailer the three men were towing and the explanation offered as to the origins of the cash was implausible. As explained in connection with the probable cause analysis, it was reasonable to infer that Reed, as a passenger in the truck, would have information concerning potential wrongdoing. Once at the station, moreover, the police officers left Reed alone and unrestrained in an unlocked conference room for long periods. He testified that he changed his mind about cooperating with authorities during periods of solitude, not as a result of browbeating or other pressure from law enforcement officers. On these facts, the court does not believe that the police

officers were attempting to exploit a Fourth Amendment violation and there is no basis for suppressing Reed's confession.

## CONCLUSION

For the reasons stated above, Reed's motion to suppress incriminating statements he made to law enforcement personnel on July 17, 2000 is again denied, and the court declines to vacate Reed's conviction and sentence.

ENTER:

Dated: Aug. 31, 2004

REBECCA R. PALLMEYER
United States District Judge